**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| STEPHANIE LOMANGINO<br><br>          Plaintiff,<br><br>                    v.<br><br>FAMILY VOICES, Inc., et al.<br><br>          Defendants. | CIVIL ACTION NO: 3:26-cv-00240<br><br><br>February 17, 2026<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff, STEPHANIE LOMANGINO, by and through the undersigned counsel, Carey & Associates, P.C., files this Complaint against Defendants, Family Voices Inc. and Allysa Ware (collectively these are "Defendants") Plaintiff alleges as follows:

## I. INTRODUCTION

1. This is an action for disability discrimination, failure to accommodate, retaliation, hostile work environment, whistleblower retaliation, wrongful discharge, and emotional distress arising from Plaintiff's employment and termination by Defendant Family Voices, Inc.

2. Plaintiff is a high-performing nonprofit executive who disclosed a psychiatric disability, requested modest workplace structure accommodations, and raised serious grant-compliance and governance concerns.

3. Rather than engage in the legally required interactive process or investigate Plaintiff's compliance reports, Defendant isolated, stigmatized, disciplined, and terminated Plaintiff using disability-coded language, procedurally improper means, and pretextual rationales.

4.  This Complaint asserts federal claims under the Americans with Disabilities Act ("ADA") and pleads related Connecticut statutory and common-law claims in the alternative.

## II. JURISDICTION AND VENUE

5.  This Court has subject-matter jurisdiction under 28 U.S.C. § 1331.

6.  Jurisdiction over Plaintiff's federal disability claims arises under 42 U.S.C. § 12117.

7.  This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.

8.  Plaintiff has timely filed charges with the EEOC and CHRO.

9.  The EEOC issued a Notice of Right to Sue on December 9, 2025 (See Exhibit 1).

10. The CHRO issued a Notice of Right to Sue on January 29, 2026 (See Exhibit 2).

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff worked in Connecticut and suffered injury here.

## III. PARTIES

12. Plaintiff Stephanie Lomangino is a resident of Connecticut.

13. Defendant Family Voices, Inc. is a nonprofit corporation doing business in Connecticut and elsewhere, with headquarters at 110 Hartwell Ave, Lexington, MA 02421.

14. At relevant times detailed in this complaint, Defendant had more than fifteen employees.

15. Defendants Allysa Ware is named in her individual capacity, she is the Executive Director of Family Voices and an individual whose address is 1007 Creek View Dr, Cleveland, OH 44119-2909.

## IV. FACTUAL ALLEGATIONS

16. Plaintiff currently resides in Connecticut. Plaintiff performed Plaintiff's work remotely from Connecticut for Defendant Family Voices, Inc. ("Defendant"). Defendant is headquartered in Massachusetts, and Plaintiff's supervisor, Nikki Montgomery and her wife Allysa Ware, were based in Ohio during the relevant period.

17. Defendant is a national nonprofit organization that advocates for, and partners with, families of children and youth with special health care needs to improve health care systems and policies. Defendant coordinates federally and privately funded programs, engaging state and national partners to promote family-centered care and equitable access to services.

18. Plaintiff was recruited by Sarah Candio and formally hired by Defendant as a Project Director in August 2023, with a start date of August 21, 2023. Plaintiff's offer letter stated Plaintiff's salary and benefits, but Plaintiff was not provided with the employee handbook during onboarding, nor was Plaintiff asked to sign confirming that Plaintiff had read it.

19. Plaintiff initially reported directly to Roseani Sanchez.

20. As a Project Director, Plaintiff provided comprehensive oversight and management of multiple federally funded projects, fiscal administration of project budgets, and coordination of deliverables and reporting to funders, partners, and Defendant's Board of Directors. Plaintiff was responsible for ensuring compliance with grant requirements, leading communications and data collection efforts, and maintaining collaborative relationships to achieve all project objectives in alignment with Defendant's mission.

21. In Plaintiff's day-to-day work, Plaintiff provided technical assistance on family engagement across Plaintiff's six projects. This meant helping partners and funders learn how to better involve families in programs, policies, and decision-making to change the health care system.

22. Allysa Ware serves as the Executive Director of Defendant and is the Principal Investigator on several research projects to which Plaintiff was assigned, while Nikki Montgomery serves as the Director of Communications and oversees all organizational materials and communications produced by Defendant.

23. From the outset of Plaintiff's employment with Defendant, Plaintiff worked closely with Ms. Ware on multiple projects under her leadership and collaborated regularly with Ms. Montgomery on presentations and communications materials that Plaintiff developed as part of Plaintiff's role.

24. During a staff retreat in August 2023, Ms. Montgomery disclosed her relationship with Ms. Ware to Plaintiff. There was no formal meeting or documentation about their relationship.

25. Plaintiff immediately noticed confusion about authority and reporting lines. Ms. Ware and Ms. Montgomery had overlapped roles and an unusually close relationship, which blurred professional boundaries and later created ethical and procedural conflicts.

26. In September 2023, Plaintiff was assigned six projects that were severely disorganized. Budget spreadsheets contained incorrect formulas and conflicting numbers, and many grant files were incomplete or missing essential supporting documents.

27. At the time, deliverables were severely behind schedule without any system in place to track progress or deadlines. Profit and loss statements in Salesforce did not align with

cash flow documents, and there was no clear or consistent process for tracking staff time or allocating resources across projects.

28. Plaintiff spent Plaintiff's first several months rebuilding these records, reconstructing timelines, and bringing each project back into compliance with funder requirements and best practices of project management to the best of Plaintiff's ability.

29. Plaintiff created detailed tracking systems for project timelines and sub-grantee management, and within 60 days, Plaintiff corrected multiple shortfalls to ensure that no funding was at risk of recall. This work included building strong relationships with each funder, completing tasks that were previously incomplete or incorrectly executed, and taking ownership of key deliverables.

30. As an example of prior problems Plaintiff inherited, in October 2023 Plaintiff discovered that recruitment for an advisory group due by November had not even been started.

31. Plaintiff immediately developed and implemented a plan to complete it on time. Plaintiff also created updated project timelines, prepared detailed board reports, and reviewed and approved or denied cash flow and profit-and-loss documents promptly.

32. Often, when Plaintiff denied documents due to errors, Plaintiff did not receive follow-up from finance management with the necessary corrected or updated information.

33. Plaintiff's early performance was exemplary. In November 2023, Plaintiff received a formal 90-day review rating Plaintiff as "exceptional."

34. In this review, Ms. Sanchez had written that Plaintiff's "leadership, organization, and project recovery work have been transformative."

35. Plaintiff's salary was increased from $77,500.00 to $80,000.00 annually in recognition of Plaintiff's performance.

36. From December 2023 through June 2024, Plaintiff was repeatedly praised by colleagues and supervisors.

37. As a result of this success, Plaintiff assumed responsibilities far beyond Plaintiff's title, managing multi-state initiatives, coordinating funders, and mentoring newer staff.

38. Ms. Sanchez frequently told Plaintiff, "You're one of the best hires we've made."

39. Around June of 2024, Ms. Nikki Montgomery became Plaintiff's supervisor following her promotion and Plaintiff's contemporaneous promotion.

40. During introductory staff calls with both Ms. Ware and Ms. Montgomery separately, Plaintiff disclosed that Plaintiff has borderline personality disorder ("BPD"), a recognized mental health condition.

41. Later in 2024, Plaintiff shared professional literature on supervising employees with BPD and explained that Plaintiff performs best when given clear expectations, predictable communication, and structured feedback.

42. Ms. Montgomery thanked Plaintiff for being open regarding Plaintiff's disability and said, "We value your honesty, it helps us support you better."

43. Plaintiff was transparent about Plaintiff's diagnosis throughout employment because Defendant presents itself publicly as an inclusive, disability-aware organization.

44. Defendant had no dedicated Human Resources department. HR-type issues were managed inconsistently by several staff members with other primary roles.

45. Will Simpson, the Director of Finance, also served as Defendant's de facto HR Director.

46. During an organizational restructuring, HR responsibilities were transferred to Ashlee Richey, the Director of Digital Operations, who assumed the HR Director role despite having no formal HR background.

47. Additionally, Sarah Candio, the Human Resources Manager, provided limited HR support but did not hold a senior leadership position or formal authority over personnel decisions.

48. By mid-2024, Plaintiff began hearing from other staff members that they too felt uncomfortable with Ms. Ware's leadership style and with her relationship with Ms. Montgomery.

49. Several employees reported to Plaintiff feeling "watched" or "triangulated."

50. This included a formal letter to Defendant's Board of Directors and HR from Tori Yepez, Project Coordinator at Defendant, who documented concerns about a conflict of interest.

51. In her written statement to Defendant's HR and Board of Directors, Ms. Yepez reported multiple incidents of misconduct and a hostile work environment created by Ms. Ware.

52. Ms. Yepez described three separate encounters between March 23 and March 28, 2023, in which Ms. Ware engaged in power harassment, intimidation, and conduct influenced by a personal conflict of interest due to her relationship with Ms. Montgomery.

53. Ms. Yepez detailed that Ms. Ware called staff meetings with little notice, approached issues with apparent bias, and labeled or discussed employees inappropriately.

54. During these interactions, Ms. Ware disregarded her own stated expectations for professionalism, including avoiding triangulation and assuming good intentions among colleagues.

55. Ms. Yepez further asserted that Ms. Ware used her authority to intimidate staff, including threatening Ms. Yepez's job during a March 28 meeting after misinterpreting comments made in the chat.

56. Following this encounter, Ms. Yepez and three colleagues experienced emotional distress severe enough to require the remainder of the day off.

57. Ms. Yepez expressed fear of retaliation by Ms. Ware and Ms. Montgomery and concern about Defendant's failure to address an ongoing hostile work environment.

58. Ms. Yepez concluded by requesting a written plan of action from Defendant's leadership.

59. Despite Ms. Yepez's letter and concerns from other staff, no action was taken.

60. In June 2024, Plaintiff received a promotion to Program Strategy Manager, in which Ms. Montgomery became Plaintiff's supervisor and Plaintiff's new role focused on implementing Defendant's organizational strategy within its programs, while Plaintiff also remained a Project Director for all of Plaintiff's projects.

61. In September 2024, Smythe Kannapell became Director of Finance after Will Simpson left the organization.

62. Bobbi Russell also joined Defendant as a part-time HR consultant.

63. Plaintiff hoped these changes would improve professionalism in HR and finance, but structural problems persisted.

64. Plaintiff was aware that other staff experienced difficulties with a hostile work environment but had previously not voiced Plaintiff's own concerns.

65. Plaintiff hoped that having a new Director of Finance would bring clarity to the finance department and ensure accurate reporting of financial and budgetary figures.

66. In December 2024, Rutgers University, one of Defendant's funders, raised concerns about project management on a contract Plaintiff oversaw and stated that it would not pay invoices for 2023 due to incorrect invoicing and incomplete deliverables, which included months before Plaintiff joined Defendant on August 21, 2023.

67. Ms. Kannapell later reported that Defendant's 2024 financial audit received negative marks related to inaccuracies in staff time and resource allocation.

68. These inaccuracies were consistent with Plaintiff's prior complaints.

69. Plaintiff's role with Rutgers as a project manager was to ensure that project deliverables were completed correctly and on time.

70. Plaintiff could not fix gaps that existed before Plaintiff started and was responsible only for supervising ongoing project activities.

71. Plaintiff did not handle submitting invoices or collecting payment, as that had been managed by Mr. Simpson.

72. Plaintiff promptly forwarded Rutgers' email to Ms. Ware, Ms. Kannapell, and Ms. Roseani Sanchez and requested a step-by-step corrective action plan.

73. Plaintiff took some ownership of the issues, but emphasized that the problems reflected a larger systemic failure in Defendant's project management practices.

74. Plaintiff shared onboarding files and stated that the gaps existed beyond Plaintiff's responsibility.

75. On December 6, 2024, Ms. Ware stated that Plaintiff put Defendant at extraordinary risk for loss of funding, stating that Plaintiff chose to forego a major job responsibility of incomplete deliverables and escalated the matter to HR.

76. Ms. Ware stated that leadership would formally document the situation and develop a clear plan of action.

77. This email communication took place while Plaintiff was on approved PTO and traveling for work the following day. These communications caused distress and interfered with

the Plaintiff's ability to manage boundaries, a critical accommodation for the Plaintiff's
condition.

78. On January 8, 2025, Plaintiff emailed Bobbi Russell requesting a formal accommodation.

79. Plaintiff requested that leadership refrain from sending work communications while
Plaintiff was on PTO or traveling.

80. Plaintiff explained that receiving critical or emotionally charged messages in those
circumstances could trigger self-harm impulses associated with Plaintiff's diagnosed
BPD and sent information about managing BPD at work, including communicating with
people with BPD.

81. Plaintiff clarified that Plaintiff was not disclosing any active threat of self-harm.

82. Plaintiff requested a timing boundary to prevent avoidable crises and to remain safely
engaged in Plaintiff's role.

83. Ms. Russell replied that the request was "unreasonable," would "require additional time
from organizational leadership," and would be "an inconvenience," and suggested
Plaintiff "simply not check [Plaintiff's] email."

84. No interactive process meeting was initiated, and no alternative accommodations were
proposed.

85. Plaintiff experienced this response as dismissive and inconsistent with disability laws.

86. Plaintiff did not immediately follow up because Plaintiff felt discouraged and did not
believe it would be productive.

87. In January 2025, after two staff-led meetings went poorly, Plaintiff privately discussed
the need for clearer preparation and agendas with Ms. Montgomery.

88. Within thirty minutes of that discussion, Ms. Ware convened an unscheduled meeting with Plaintiff, Ms. Montgomery, and other staff to question their preparation.

89. Plaintiff inferred that Ms. Montgomery repeated Plaintiff's private comments to Ms. Ware.

90. Plaintiff observed that Ms. Ware and Ms. Montgomery lived in the same household.

91. Plaintiff became concerned that private supervisory conversations were being shared.

92. Plaintiff became concerned that sensitive issues, including accommodation needs, could not be raised.

93. Around December 2024, another employee, Mary Ann Vega, confided in Plaintiff via text message that Ms. Vega was experiencing significant hearing loss and had requested accommodations from Ms. Russell but never received a reply.

94. Shortly thereafter, Ms. Vega was told by Ms. Kannapell that Defendant was using Ms. Vega's disability "as an excuse for poor performance."

95. Ms. Vega shared Ms. Kannapell's email with Plaintiff.

96. Ms. Vega later referenced the same email in Ms. Vega's resignation letter.

97. Ms. Vega submitted Ms. Vega's resignation from Defendant effective January 31, 2025.

98. Ms. Vega cited challenges including managing disabilities and experiencing homelessness.

99. Ms. Vega reported that, despite notifying HR of accommodation needs, no process was implemented to document or support a performance improvement plan.

100.     Ms. Vega reported that communications from Ms. Kannapell, including references to Ms. Vega's "litany of excuses," left Ms. Vega feeling accused rather than supported.

101.    Ms. Vega reported that no clear plan or guidance was provided during the transition in the Finance Department.

102.    Ms. Vega reported that Defendant did not provide promised accommodations, clarity, or support.

103.    Plaintiff observed that Ms. Vega's experience mirrored Plaintiff's own experience.

104.    Plaintiff feared retaliation and did not make further complaints at that time.

105.    In March 2025, Ms. Montgomery conducted a "90-day review," even though Plaintiff had been in the position of Program Strategy Manager for nine months at that point (since June 2024).

106.    Plaintiff again received an outstanding evaluation noting Plaintiff was "dependable, collaborative, and highly productive."

107.    Ms. Montgomery referenced exit interviews from former employees claiming Plaintiff triangulated colleagues.

108.    Plaintiff disputed that understanding.

109.    Plaintiff reminded Ms. Montgomery that clear supervision structures prevent such dynamics since transitioning into the new role.

110.    Plaintiff inferred that Ms. Ware had obtained details of exit interviews and shared them with Ms. Montgomery despite expectations of confidentiality.

111.    Plaintiff observed that the close personal and professional relationship between Ms. Ware and Ms. Montgomery influenced internal communications.

112.    Plaintiff became concerned that sensitive information regarding staff experiences and feedback could be used inappropriately.

113.     Plaintiff felt unable to safely raise concerns or be candid without triangulation between Ms. Ware and Ms. Montgomery.

114.     In early April 2025, Plaintiff discovered that Defendant had received a new grant from the New York School-Based Health Alliance ("NYSBHA") naming Plaintiff as Principal Investigator.

115.     Plaintiff had never been shown the final budget before the grant launch.

116.     When Plaintiff obtained the budget, the numbers were inaccurate, including miscalculation of participant stipends recorded as $1,000 instead of $5,000.

117.     The inaccuracy affected staff time allocation and caused confusion with the funder.

118.     Ms. Ware had previously told Plaintiff that Defendant was not responsible for stipends, which was incorrect.

119.     Ms. Kannapell did not appear to be involved in budget negotiations or calculations.

120.     Ms. Kannapell indicated she was not aware of the budget details.

121.     Plaintiff told Ms. Montgomery that this was a process gap requiring verified budgets and proper approvals.

122.     On April 17, 2025, Ms. Ware messaged Plaintiff expressing disappointment and raising adaptability concerns.

123.     Plaintiff replied that Plaintiff was not upset but reporting a process gap.

124.     Plaintiff's reporting reflected longstanding issues with conflicting budgets and financial oversight that were initiated by Ms. Ware as the Executive Director or managed

by the finance department. Plaintiff could not properly monitor budget activities because of longstanding mismanagement by leadership from budget initiation.

125.     These issues reflected lack of proper financial oversight by Ms. Ware as Executive Director.

126.     Plaintiff experienced increased hostility from Ms. Ware following Plaintiff's reporting.

127.     Ms. Ware told Plaintiff that Plaintiff was "inflexible."

128.     Ms. Ware stated Plaintiff expected everything "tied neatly in a bow."

129.     These remarks followed Plaintiff's disclosure of BPD and requested accommodations.

130.     Plaintiff reasonably understood these statements to be disability-based, as they echoed common stigmatizing narratives associated with BPD, including perceptions of rigidity and unreasonable expectations, and were not grounded in Plaintiff's documented performance or job requirements.

131.     Plaintiff's disability disclosures were reframed as performance issues.

132.     On May 5, 2025, Plaintiff submitted a review documenting concerns about Ms. Ware's behavior.

133.     Plaintiff documented that Ms. Ware's written communication invoked fear and anxiety.

134.     Plaintiff documented a need to know more about how projects are initiated.

135.     In July 2025, Plaintiff verbally shared with Ms. Russell concerns about predictable communication and Ms. Ware's behavior.

136.     Plaintiff shared conflict-of-interest concerns she had regarding Ms. Ware and Ms. Montgomery and how they were treating her.

137.     Plaintiff's compliance reporting was protected activity.

138.     Ms. Russell acknowledged Plaintiff's concern.

139.     Within days, on July 20, Plaintiff began receiving accusatory messages from leadership after hours alleging Plaintiff was undermining trust because she was not seeking proper approvals for work including a blog post with a funder and the creation of a Google site for an advisory group, a common practice for community-based work, for another funder in which Ms. Ware is a Co-Principal Investigator.

140.     Plaintiff responded there is no process documenting the need for approval on such activities and suggested a process for internal approval and project approval. Plaintiff stated that she was not discussing this further until there was a meeting scheduled.

141.     Ms. Ware replied stating "You can go ahead and place yourself on administrative leave pending a conversation with Bobbi since you do not wit to discuss this further."

142.     Plaintiff was abruptly placed on administrative leave for "insubordination" by Ms. Ware via Teams. She also sent a text message to Plaintiff's personal cell phone stating "Good evening Steph – I am informing you that you have been placed on 3 days of administrative leave effective immediately. Your access to Family Voices system has been removed until a resolution has been determined. Bobbi will be in touch regarding next steps. Thank you."

143.     Plaintiff asked the reason and Ms. Ware responded "Insubordination is the reason."

144.     Plaintiff had received no prior warning, counseling, or written documentation.

145.    On July 21, 2025, Plaintiff emailed Ms. Russell requesting the disciplinary and investigation policies, the definition of insubordination, and an explanation for revoking system access.

146.    Ms. Russell sent the handbook but offered no explanation.

147.    The handbook contained no definition of "insubordination."

148.    On July 23, 2025, Plaintiff attended a meeting with Ms. Ware, Ms. Montgomery, and Ms. Russell.

149.    Ms. Ware and Ms. Montgomery were together in a car and appeared off camera.

150.    Ms. Russell directed that the underlying issues would not be discussed.

151.    Ms. Ware stated Plaintiff must follow organizational hierarchy and approval protocols, implement decisions even if Plaintiff disagreed, and act in accordance with leadership expectations.

152.    Ms. Ware stated prior actions would not be discussed.

153.    Ms. Ware stated Plaintiff's commitment to move forward would determine whether Plaintiff remained employed.

154.    Plaintiff was offered the option to return temporarily or take additional leave.

155.    Plaintiff scheduled a future check-in and agreed to their expectations out of fear of losing employment.

156.    Ms. Russell emailed Plaintiff a summary offering collaboration on an exit strategy and advising Plaintiff not to discuss the matter with colleagues.

157.    Ms. Russell offered coaching and scheduled an August 12 check-in.

158.    Defendant's progressive discipline policy required documentation and meetings but was not followed.

159.     Defendant's policy provided for escalating discipline, documentation, and
employee response, none of which occurred.

160.     On August 12, 2025, Plaintiff revisited accommodation requests verbally and later
in writing. She sent further information about accommodations for employee's with
psychiatric disabilities.

161.     Plaintiff once again explained that her BPD condition was triggered or
exacerbated when she was not provided with clear expectations or respectful
communications.  Plaintiff reiterated that she was requesting this accommodation for her
BPD, specifically requesting structured conversations, advance agendas, balanced
feedback, and clear written expectations.

162.     Ms. Ware responded with a series of questions that the Plaintiff inferred as
"poking holes" in the request. Ms. Ware asked about medical documentation and
recommendations for accommodations from the medical provider, asked how I would
"operationalize" the request, how Plaintiff planned to do the same (have structured
conversations, send advance agendas, give balanced feedback, and clear written
expectations) to others, and how to handle situations that were urgent and didn't allow
time for written correspondence.

163.     Plaintiff responded to Ms. Ware with answers to all of the questions.

164.     Plaintiff requested a travel-related anxiety accommodation from Ms. Montgomery
but was never given any formal accommodation.

165.     On September 8, 2025, Ms. Russell emailed that accommodations Plaintiff sought
were unreasonable due to organizational size and workload.

166.     Plaintiff replied, explaining Plaintiff struggled most in conversations with management and to provide ways that the accommodations could be implemented. Plaintiff shared the U.S. Department of Labor Office of Disability Employment Policy for accommodations for people with psychiatric disabilities and highlighted the guidance that mirrored Plaintiff's requested accommodations. Plaintiff asked "Can you provide additional thoughts about why the highlighted bullet points do not fall under reasonable accommodation at Family Voices?"

167.     Ms. Russell responded that the organization had reached the end of the road with regard to that discussion with no follow-up meeting occurred and no accommodation was implemented.

168.     Plaintiff was afraid to follow up after this abrupt dismissal out of fear of retaliation.

169.     On October 1, 2025, Plaintiff privately texted Ms. Kannapell, who she felt was a trusted confidant, expressing distress.

170.     In that correspondence, Plaintiff referenced feeling backed into a corner and Plaintiff's BPD-related frustration.

171.     On October 2, 2025, Plaintiff requested to meet with Ms. Montgomery to discuss about the frustrations with Ms. Ware (her wife).

172.     Ms. Montgomery assured Plaintiff the meeting was not about Plaintiff specifically.

173.     Plaintiff used the meeting to suggest budget distribution improvements.

174.     Ms. Montgomery ostensibly agreed with Plaintiff's suggestion at the meeting.

175.    However, the Plaintiff was then able to infer that Ms. Montgomery relayed information to Ms. Ware.

176.    Ms. Ware had obtained screenshots of Plaintiff's texts with Ms. Kannapell.  In these texts, Plaintiff was specifically explaining to Ms. Kannapell that her BPD was aggravated by the hostility and lack of accommodations that she was experiencing from Ms. Montgomery and Ms. Ware.

177.    Ms. Ware texted Plaintiff stating the screenshots were disturbing.

178.    Ms. Ware stated Plaintiff's tears reflected perfectionism and inability to hear criticism.

179.    Ms. Ware stated she did not see a path forward and she accused Plaintiff of building a coalition against her.

180.    Plaintiff experienced anxiety and distress in response to these accusations.

181.    On October 3, 2025, leadership engaged in a chat affirming Ms. Ware had done nothing wrong.

182.    Plaintiff was forced to apologize.

183.    Over the next week, Plaintiff observed colleagues withdrawing from her.

184.    On October 8, 2025, Plaintiff was terminated.

185.    Ms. Ware cited triangulation, insubordination, blurring boundaries, perfectionism, and inability to accept criticism.

186.    Ms. Ware stated Plaintiff "posed a risk." When Plaintiff asked what she meant by posing a risk, Ms. Ware stated that the amount of time and support Plaintiff needed was financially burdensome to the organization.

187.    Plaintiff's compliance insistence was treated as a threat.

188.     Plaintiff reminded leadership of Plaintiff's disability and accommodations and explained how she felt it was unfair that they were used against her.

189.     Hours after the termination of Plaintiff, Ms. Ware disclosed her romantic relationship with Ms. Montgomery to the rest of the agency.

190.     Prior concerns raised about the relationship creating a conflict of interest had been ignored, despite Plaintiff's awareness of multiple employee complaints of the same.

191.     Plaintiff experienced severe anxiety and required increases to her medication.

192.     Plaintiff required crisis support as a result of the job stress and termination.

193.     Plaintiff suffered reputational harm which directly impacts her long term career.

194.     Plaintiff lost wages and benefits exceeding $100,000 annually.

195.     In the process of her discipline, Plaintiff was subjected to procedural violations including lack of warnings and investigation.

196.     Employees without disabilities or whistleblower activity were not disciplined similarly.

197.     Plaintiff remains under psychiatric care.

Plaintiff continues to suffer emotional and financial harm.


## V. CLAIMS FOR RELIEF

**COUNT I — Disability Discrimination & Retaliation (ADA)**

(Family Voices Inc. Defendant)

198.     Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

199.    At all relevant times, Plaintiff was an individual with a disability within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12102, in that she has a diagnosed psychiatric impairment, borderline personality disorder, which substantially limits one or more major life activities, including emotional regulation, stress tolerance, sleep, concentration, and neurological stability.

200.    Defendants had actual knowledge of Plaintiff's disability. Plaintiff disclosed her diagnosis to her supervisors, explained its functional impact, shared professional literature regarding appropriate supervision, and expressly requested modest, targeted accommodations to allow her to perform her job safely and effectively.

201.    Plaintiff was qualified to perform the essential functions of her position, with or without reasonable accommodation. Plaintiff consistently performed at an exceptional level, received outstanding performance evaluations, pay increases, promotions, and praise from supervisors and colleagues, and was entrusted with responsibilities beyond her formal role.

202.    Following Plaintiff's disclosure of her disability and accommodation needs, Defendants' treatment of Plaintiff materially changed.

203.    Defendants subjected Plaintiff to differential scrutiny, stigmatizing language, hostile communications, and escalating discipline that were not imposed on similarly situated non-disabled employees.

204.    Defendants repeatedly characterized Plaintiff as "inflexible," "rigid," and expecting things "tied neatly in a bow", language that directly tracked Plaintiff's disability-related disclosures regarding her need for structure, predictability, and clarity, and which functioned as coded references to her psychiatric condition.

205.     Defendants used Plaintiff's disability-related traits, such as her need for clear expectations, advance notice, and structured communication, as grounds for criticism, discipline, and ultimately termination, rather than engaging in the legally required interactive process.

206.     Defendants failed and refused to engage in any good-faith interactive process in response to Plaintiff's accommodation requests, despite Plaintiff's repeated efforts to explain her needs, the minimal burden of the requested accommodations, and the serious risk to Plaintiff's health if boundaries were not respected.

207.     Instead of accommodating Plaintiff, Defendants:

a. Denied her accommodation requests as "unreasonable" and "inconvenient";

b. Blamed Plaintiff for not simply "not checking email" while on PTO despite knowing this was not a viable or safe solution given her condition;

c. Continued sending emotionally charged and critical communications during Plaintiff's PTO and personal time;

d. Escalated hostility and scrutiny after Plaintiff raised concerns; and

e. Used pretextual accusations of "insubordination" and "trust issues" to justify adverse actions.

208.     Defendants' actions constituted discrimination on the basis of disability in violation of 42 U.S.C. § 12112(a), including by:

a. Treating Plaintiff less favorably than non-disabled employees;

b. Imposing adverse terms and conditions of employment because of Plaintiff's disability;

c. Using disability-related characteristics as negative performance criteria; and

d. Terminating Plaintiff because of her disability and her need for accommodation.

209.    Defendants' conduct was intentional, willful, and taken with reckless disregard for Plaintiff's federally protected rights.

210.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer:

a. Loss of employment, income, and benefits;

b. Emotional distress, humiliation, anxiety, and psychological harm;

c. Exacerbation of her medical condition; and

d. Other compensatory and consequential damages.

211.    Defendants' conduct was malicious or recklessly indifferent to Plaintiff's federally protected rights, entitling Plaintiff to an award of punitive damages under 42 U.S.C. § 1981a.

**COUNT II- Failure to Accommodate (ADA)**

(Family Voices Inc. Defendant)

212.    Defendants were required by law to provide reasonable accommodations to qualified employees with known disabilities unless doing so would impose an undue hardship.

213.    Plaintiff requested reasonable accommodations, including predictable communication boundaries, advance notice for emotionally charged discussions, structured feedback, and protection from after-hours critical communications, all of

which were modest, low-cost, and directly tied to Plaintiff's ability to perform her job safely and effectively.

214.     Defendants failed and refused to engage in a good-faith interactive process in response to Plaintiff's requests.

215.     Defendants denied Plaintiff's requests summarily, labeled them "unreasonable" and "inconvenient," and suggested Plaintiff "simply not check email," rather than exploring alternatives or proposing any accommodation.

216.     Defendants' failure to engage in the interactive process and to provide reasonable accommodations constitutes discrimination on the basis of disability in violation of 42 U.S.C. § 12112(b)(5)(A).

217.     As a direct and proximate result of Defendants' failure to accommodate, Plaintiff suffered worsening of her medical condition, emotional distress, and ultimately loss of employment.

218.     Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

219.     The ADA prohibits retaliation against any individual because such individual has opposed any act or practice made unlawful by the ADA, or because such individual has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the ADA.

220.     Plaintiff engaged in protected activity within the meaning of the ADA by, inter alia:

    a. Disclosing her disability to Defendants;

    b. Requesting reasonable accommodations for her disability;

c. Complaining to Human Resources and management about Defendants' failure to accommodate;

d. Reporting that Defendants' communications and practices were harming her health and exacerbating her condition;

e. Submitting a written 360-review documenting concerns about leadership behavior, anxiety, and fear-inducing communications;

f. Raising concerns regarding conflicts of interest, hostile work environment,   and governance failures; and

g. Opposing Defendants' discriminatory and unlawful practices.

221.     Defendants had actual knowledge of Plaintiff's protected activity.

222.     Following Plaintiff's protected activity, Defendants subjected Plaintiff to materially adverse actions that would dissuade a reasonable employee from engaging in protected activity, including but not limited to:

a. Escalating hostility, scrutiny, and accusatory communications;

b. Characterizing Plaintiff as untrustworthy, insubordinate, or disruptive;

c. Placing Plaintiff on abrupt administrative leave without warning;

d. Cutting off system access and isolating Plaintiff from colleagues;

e. Threatening Plaintiff's continued employment unless she ceased raising concerns;

f. Offering an "exit strategy" in lieu of addressing her complaints; and

g. Ultimately terminating Plaintiff's employment.

223.     The temporal proximity between Plaintiff's protected activity and Defendants' adverse actions, including the escalation following Plaintiff's accommodation requests,

her 360-review, and her conflict-of-interest disclosures, supports a causal inference of retaliation.

224.     Defendants' stated reasons for disciplining and terminating Plaintiff were pretextual and inconsistent, and shifted over time.

225.     Defendants labeled Plaintiff's conduct "insubordination" and "lack of trust," but failed to identify any legitimate misconduct, violated their own progressive discipline policies, refused to explain the basis for discipline, and prohibited discussion of the underlying issues.

226.     Defendants' conduct was intended to punish Plaintiff for engaging in protected activity and to deter Plaintiff and other employees from asserting their rights under the ADA.

227.     Defendants' actions constitute unlawful retaliation in violation of 42 U.S.C. § 12203.

228.     As a direct and proximate result of Defendants' retaliatory conduct, Plaintiff has suffered and continues to suffer:

      a. Loss of employment, income, and benefits;

      b. Emotional distress, humiliation, and psychological harm;

      c. Worsening of her medical condition; and

      d. Other compensatory and consequential damages.

229.     Defendants' conduct was willful, malicious, and taken with reckless disregard for Plaintiff's federally protected rights, entitling Plaintiff to punitive damages.


**COUNT III — Hostile Work Environment & Retaliation (ADA)**

(Family Voices Inc. Defendant)

230.    Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

231.    The ADA prohibits subjecting an employee to a hostile or abusive work environment because of disability.

232.    At all relevant times, Plaintiff was an individual with a disability within the meaning of the ADA, and Defendants had actual knowledge of Plaintiff's disability.

233.    Defendants subjected Plaintiff to unwelcome conduct because of her disability, including but not limited to:

       a. Stigmatizing and coded remarks about Plaintiff's need for structure, predictability, and clarity, including characterizing Plaintiff as "rigid," "inflexible," and expecting things "tied neatly in a bow";

       b. Dismissing Plaintiff's disability-related needs as unreasonable, inconvenient, or burdensome;

       c. Sending emotionally charged, critical, and destabilizing communications during Plaintiff's PTO, evenings, and personal time despite knowing such conduct exacerbated Plaintiff's condition;

       d. Treating Plaintiff's disability-related traits as character flaws or performance deficiencies;

       e. Isolating Plaintiff, cutting off access, and excluding her from normal workplace processes;

       f. Using confidential and sensitive information about Plaintiff and others inappropriately; and

g. Subjecting Plaintiff to escalating scrutiny and hostility after she disclosed her disability and requested accommodations.

234.    This conduct was severe and pervasive, both objectively and subjectively.

235.    A reasonable person in Plaintiff's position would find the work environment hostile, abusive, and intimidating, and Plaintiff in fact experienced it as such.

236.    The hostile conduct interfered with Plaintiff's ability to perform her job, caused anxiety and distress, exacerbated her medical condition, and undermined her sense of psychological safety in the workplace.

237.    The hostile environment was created and perpetuated by Plaintiff's supervisors and senior leadership, including the Executive Director and Plaintiff's direct supervisor.

238.    Defendants knew or should have known of the hostile environment and failed to take prompt or effective remedial action.

239.    Instead of correcting the hostile environment, Defendants escalated it after Plaintiff complained, sought accommodations, and raised concerns.

240.    Defendants' conduct altered the terms and conditions of Plaintiff's employment and constituted unlawful harassment on the basis of disability in violation of the ADA.

241.    As a direct and proximate result of Defendants' hostile and abusive conduct, Plaintiff has suffered and continues to suffer:

    a. Emotional distress, humiliation, and psychological harm;

    b. Worsening of her medical condition;

    c. Loss of employment and career disruption; and

    d. Other compensatory and consequential damages.

242.     Defendants' conduct was willful, malicious, and taken with reckless disregard for Plaintiff's federally protected rights, entitling Plaintiff to punitive damages.

**COUNT IV — Disability Discrimination & Retaliation (CFEPA)**

*(Family Voices Inc. Defendant)*

243.     Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

244.     The Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60, prohibits employers from discriminating against an employee because of disability and from retaliating against an employee for opposing discriminatory practices or for exercising rights protected under the statute.

245.     At all relevant times, Plaintiff was an individual with a disability within the meaning of CFEPA.

246.     Defendants had actual knowledge of Plaintiff's disability.

247.     Plaintiff was qualified for her position and performed her job at a high level, with or without reasonable accommodation.

248.     Defendants discriminated against Plaintiff on the basis of her disability by, inter alia:

     a. Subjecting Plaintiff to differential scrutiny, stigmatization, and hostility after disclosure of her disability;

     b. Treating disability-related needs and traits as performance deficiencies or character flaws;

c. Denying Plaintiff reasonable accommodations without engaging in any meaningful interactive process;

d. Escalating discipline and scrutiny after Plaintiff sought accommodations and raised concerns; and

e. Terminating Plaintiff's employment because of her disability and her need for accommodation.

249.    Plaintiff engaged in protected activity under CFEPA by opposing Defendants' discriminatory practices, requesting accommodations, and complaining internally about Defendants' unlawful conduct.

250.    Defendants had actual knowledge of Plaintiff's protected activity.

251.    Defendants retaliated against Plaintiff by subjecting her to materially adverse actions, including heightened scrutiny, isolation, discipline, administrative leave, and termination, because she engaged in protected activity.

252.    There is a causal connection between Plaintiff's protected activity and Defendants' adverse actions, as evidenced by close temporal proximity, escalating hostility following Plaintiff's complaints, and Defendants' shifting and pretextual explanations.

253.    Defendants' conduct was intentional, willful, and taken with reckless disregard for Plaintiff's rights under Connecticut law.

254.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer economic loss, emotional distress, and other damages recoverable under Connecticut law.

**COUNT V — Hostile Work Environment (CFEPA)**

*(Family Voices Inc. Defendant)*

255.     Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

256.     The Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60, prohibits harassment and discrimination in the workplace on the basis of disability and other protected characteristics.

257.     At all relevant times, Plaintiff was an individual with a disability within the meaning of CFEPA, and Defendants had actual knowledge of Plaintiff's disability.

258.     Defendants subjected Plaintiff to unwelcome conduct because of her disability, including but not limited to:

a. Stigmatizing, dismissive, and coded remarks regarding Plaintiff's disability-related needs for structure, predictability, and clarity;

b. Treating Plaintiff's disability-related traits as character flaws, performance problems, or disciplinary issues;

c. Repeatedly sending emotionally charged, critical, and destabilizing communications during Plaintiff's PTO, evenings, and personal time despite knowing such conduct exacerbated Plaintiff's medical condition;

d. Isolating Plaintiff, excluding her from normal workplace processes, and cutting off access;

e. Subjecting Plaintiff to escalating scrutiny, hostility, and accusatory treatment after she

disclosed her disability and sought accommodations; and

f. Misusing sensitive and confidential information about Plaintiff and other employees in ways that undermined Plaintiff's psychological safety.

259.    This conduct was severe and pervasive.

260.    A reasonable person in Plaintiff's position would find the work environment hostile, intimidating, and abusive, and Plaintiff in fact experienced it as such.

261.    The hostile conduct interfered with Plaintiff's ability to perform her job, caused anxiety and distress, exacerbated her medical condition, and altered the terms and conditions of her employment.

262.    The hostile environment was created and perpetuated by Plaintiff's supervisors and senior leadership.

263.    Defendants knew or should have known of the hostile work environment and failed to take prompt or effective remedial action.

264.    Instead of correcting the hostile environment, Defendants escalated it after Plaintiff complained, sought accommodations, and raised concerns.

265.    Defendants' conduct constitutes unlawful harassment and discrimination in violation of CFEPA.

266.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered emotional distress, psychological harm, exacerbation of her medical condition, economic loss, and other damages recoverable under Connecticut law.

**COUNT VI — Retaliation for Protected Speech (Conn. Gen. Stat. § 31-51q)**

*(Family Voices Inc. Defendant)*

267.     Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

268.     Connecticut General Statutes § 31-51q prohibits an employer from discharging, disciplining, or otherwise penalizing an employee on account of the exercise by such employee of rights guaranteed by the First Amendment to the United States Constitution and by Article First of the Connecticut Constitution, including the right to speak on matters of public concern.

269.     Connecticut public policy likewise prohibits employers from retaliating against employees who report or speak out against unlawful conduct, particularly where such conduct implicates regulatory compliance, public funding, governance obligations, or misuse of public resources.

270.     Plaintiff engaged in protected speech on matters of public concern by, inter alia: Plaintiff made reports in good faith and based on a reasonable belief that Defendants were violating or were about to violate applicable laws, regulations, and public policy.

271.     Plaintiff expressed these concerns through speech to supervisors, Human Resources, senior leadership, and the Board or its agents.

272.     Plaintiff's speech addressed matters of public concern, including the misuse of public funds, violations of grant and audit requirements, nonprofit governance failures, and conduct implicating regulatory compliance and financial accountability.

273.     Plaintiff's speech was made in good faith, was not unduly disruptive to Defendant's operations, and did not interfere with Plaintiff's job performance.

274.        Defendants had actual knowledge of Plaintiff's protected speech.

275.        Following Plaintiff's protected speech, Defendants subjected Plaintiff to

materially adverse actions, including but not limited to:

       a. Heightened scrutiny and hostility;

       b. Accusations of disloyalty, insubordination, or lack of trust;

       c. Isolation, exclusion, and restriction of access;

       d. Administrative leave without warning;

       e. Pressure to accept an "exit strategy" rather than continue raising concerns; and

       f. Termination of employment.

276.        The temporal proximity between Plaintiff's protected speech and Defendants'

adverse actions supports a causal inference of retaliation.

277.        Defendants' stated reasons for disciplining and terminating Plaintiff were

pretextual, shifting, and inconsistent with Defendants' own policies and practices.

278.        Defendants retaliated against Plaintiff to punish her for engaging in protected

speech and to deter Plaintiff and others from raising concerns regarding unlawful and

unethical practices.

279.        Defendants' conduct violated Conn. Gen. Stat. § 31-51q and Connecticut public

policy.

280.        As a direct and proximate result of Defendants' retaliatory conduct, Plaintiff has

suffered loss of employment, loss of income and benefits, emotional distress, reputational

harm, and other damages.


**COUNT VII — Wrongful Discharge in Violation of Public Policy**

*(Family Voices Inc. Defendant)*

281.     Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

282.     Connecticut recognizes a common-law cause of action for wrongful discharge where an employer terminates an employee for reasons that violate a clear and important public policy.

283.     The public policies implicated in this case include, inter alia:

a. The public policy favoring protection of employees who report or oppose unlawful conduct, including violations of state and federal law governing nonprofit organizations, public funding, financial accountability, and grant compliance;

b. The public policy prohibiting discrimination and retaliation against individuals with disabilities;

c. The public policy favoring lawful, ethical, and transparent administration of public and charitable funds; and

d. The public policy protecting employees from being forced to choose between their livelihood and compliance with the law.

284.     Plaintiff was terminated because she reported, opposed, and refused to participate in conduct she reasonably believed violated state and federal law and fundamental public policy, including but not limited to improper grant administration, inaccurate financial reporting, and governance failures.

285.      Plaintiff's termination was not based on legitimate business reasons but was instead motivated by Defendants' desire to silence her, punish her for raising concerns, and deter others from engaging in similar protected conduct.

286.      Defendants' conduct undermines important societal interests in lawful nonprofit governance, protection of public resources, and enforcement of anti-discrimination and anti-retaliation norms.

287.      Defendants' termination of Plaintiff under these circumstances violates Connecticut's public policy and is wrongful under Connecticut common law.

288.      As a direct and proximate result of Defendants' wrongful discharge, Plaintiff has suffered loss of employment, loss of income and benefits, emotional distress, reputational harm, and other damages.

## COUNT VIII — Aiding and Abetting Discrimination and Retaliation

*(Allysa Ware Defendant*)

289.      Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

290.      At all relevant times, Defendant Allysa Ware worked closely with Plaintiff and was a managerial employee of Defendant Family Voices, Inc., with authority over Plaintiff's work assignments, discipline, administrative status, accommodation requests, and termination.

291.    Conn. Gen. Stat. § 46a-60(b)(5) makes it an unlawful discriminatory practice for any person, whether an employer or an employee or not, to aid, abet, incite, compel, or coerce the doing of any act declared to be a discriminatory employment practice under Connecticut law.

292.    Defendant Ware had actual knowledge of Plaintiff's disability, Plaintiff's requests for reasonable accommodation, and Plaintiff's engagement in protected activity opposing disability discrimination and retaliation.

293.    With that knowledge, Defendant Ware knowingly and intentionally aided, abetted, incited, compelled, and coerced Defendant Family Voices, Inc. to engage in discriminatory and retaliatory conduct against Plaintiff.

294.    Ware's aiding and abetting conduct included, but was not limited to:

    a.  Participating in and endorsing the denial of Plaintiff's reasonable accommodation requests and the refusal to engage in a good-faith interactive process;

    b.  Escalating and endorsing disciplinary actions against Plaintiff after Plaintiff engaged in protected activity;

    c.  Participating in and directing the decision to place Plaintiff on administrative leave;

    d.  Participating in and directing the decision to terminate Plaintiff's employment;

    e.  Making and endorsing disability-coded statements about Plaintiff, including characterizing Plaintiff's accommodation needs as a "burden" or "risk," and framing Plaintiff's protected needs and conduct as operational problems.

295.    Ware's conduct was not passive or incidental. Ware affirmatively encouraged, validated, and facilitated the discriminatory and retaliatory actions taken by Family Voices, Inc., and used her supervisory authority to implement and enforce them.

296.    Ware acted with discriminatory and retaliatory intent, and at a minimum with reckless disregard for Plaintiff's rights under the Connecticut Fair Employment Practices Act.

297.    Ware's conduct was a substantial factor in causing the adverse employment actions Plaintiff suffered, including denial of accommodation, escalation of discipline, administrative leave, and termination.

298.     As a direct and proximate result of Ware's unlawful conduct, Plaintiff suffered

economic loss, emotional distress, reputational harm, and other compensable damages.

299.     Defendant Ware is therefore individually liable to Plaintiff for aiding and abetting

discrimination and retaliation in violation of Conn. Gen. Stat. § 46a-60(b)(5).

## COUNT IX — Negligent Infliction of Emotional Distress

*(Family Voices Inc. Defendant)*

300.     Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth

herein.

301.     Under Connecticut law, an employer is liable for negligent infliction of emotional

distress when, in the course of termination or the termination process, the employer

engages in unreasonable conduct that it should have realized involved an unreasonable

risk of causing emotional distress likely to result in illness or bodily harm.

302.     Defendants owed Plaintiff a duty to conduct the termination of her employment in

a reasonable, dignified, and lawful manner.

303.     Defendants breached that duty by, inter alia:

a. Abruptly placing Plaintiff on administrative leave without warning,

explanation, or an opportunity to be heard;

b. Cutting off Plaintiff's system access and isolating her without prior notice or

procedural safeguards;

c. Refusing to explain the basis for discipline or termination;

d. Prohibiting Plaintiff from discussing the situation with colleagues;

e. Offering an "exit strategy" in lieu of addressing Plaintiff's legitimate concerns;

f. Conducting the termination process in a manner that was coercive, humiliating, and destabilizing; and

g. Ignoring Plaintiff's known medical vulnerability and the foreseeable emotional and physical impact of Defendants' conduct.

304.    Defendants knew or should have known that this manner of handling Plaintiff's termination and related processes involved an unreasonable risk of causing severe emotional distress.

305.    Defendants' conduct was unreasonable under the circumstances and fell below the standard of care owed to Plaintiff.

306.    As a direct and proximate result of Defendants' negligence, Plaintiff suffered severe emotional distress, anxiety, humiliation, exacerbation of her medical condition, and other psychological and physical harm.

307.    Plaintiff's emotional distress was foreseeable and serious, and resulted in actual injury.


**COUNT X — Intentional Infliction of Emotional Distress**

*(Against Both Defendants)*

308.    Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

309.    Under Connecticut law, a defendant is liable for intentional infliction of emotional distress when the defendant intentionally or recklessly engages in extreme and outrageous conduct that causes severe emotional distress to another.

310.    Defendants engaged in extreme and outrageous conduct toward Plaintiff, including but not limited to:

    a. Exploiting Plaintiff's known psychiatric disability and medical vulnerability as grounds for stigmatization, discipline, and exclusion;

    b. Dismissing Plaintiff's requests for protection from destabilizing communications while knowingly continuing such conduct;

    c. Escalating hostility, scrutiny, and accusations after Plaintiff disclosed her disability and sought accommodations;

    d. Abruptly isolating Plaintiff, cutting off her access, and placing her on leave without explanation;

    e. Threatening Plaintiff's employment unless she ceased raising concerns and complied with improper demands;

    f. Prohibiting Plaintiff from discussing her situation with colleagues; and

    g. Using Defendants' institutional power to coerce, silence, and psychologically destabilize Plaintiff.

311.    Defendants knew that Plaintiff was psychologically vulnerable and that their conduct was likely to cause severe emotional harm, and they proceeded anyway with reckless disregard for Plaintiff's wellbeing.

312.    Defendants' conduct exceeded all bounds of decency tolerated in a civilized society and was atrocious and utterly intolerable.

313.    Defendants intended to cause Plaintiff emotional distress, or at a minimum acted with reckless disregard of the near certainty that such distress would occur.

314.    As a direct and proximate result of Defendants' conduct, Plaintiff suffered severe

emotional distress, including anxiety, humiliation, psychological trauma, exacerbation of

her medical condition, and other serious emotional and physical harm.

315.    Plaintiff's emotional distress was severe and of a nature that no reasonable person

should be expected to endure.

## VI. DAMAGES

As a direct and proximate result of Defendants' unlawful, retaliatory, and tortious

conduct, Plaintiff has suffered and continues to suffer economic loss, emotional distress,

psychological harm, reputational injury, and other damages. Plaintiff seeks the following relief:

A. Economic Damages: including but not limited to:

i. Back Pay, including lost wages, salary, bonuses, and other compensation from the date

of Defendants' unlawful actions to the date of judgment;

ii. Front Pay, in lieu of reinstatement or where reinstatement is not feasible;

iii. Lost Benefits, including but not limited to health insurance, retirement benefits,

equity, incentive compensation, and other fringe benefits;

iv. Out-of-Pocket Expenses, including medical expenses, therapy, mitigation costs, and

job search expenses.

B. Compensatory Damages for all non-economic losses, including but not limited to:

i. Emotional distress, anxiety, humiliation, and mental anguish;

ii. Psychological trauma and exacerbation of Plaintiff's medical condition;

iii. Loss of professional standing and enjoyment of life;

iv. Physical manifestations of emotional distress.

v. Reputational Damages, including harm to Plaintiff's professional reputation, career trajectory, and standing in her field.

C. Statutory and Punitive Damages

i. Punitive Damages, where permitted by law, including under the ADA and Connecticut common law, to punish and deter Defendants' willful and reckless misconduct;

ii. Statutory Damages and Penalties, where available under applicable statutes, including Conn. Gen. Stat. § 31-51q.

D. Equitable and Injunctive Relief, including but not limited to:

i. Reinstatement or placement in a comparable position (where appropriate);

ii. Expungement of negative personnel records;

iii. Injunctive relief prohibiting Defendants from engaging in similar unlawful conduct;

iv. Implementation of lawful accommodation, reporting, and anti-retaliation policies.

E. Attorneys' Fees and Costs: Reasonable Attorneys' Fees and Costs, including expert fees and litigation expenses, as provided by statute and law.

F. Pre- and Post-Judgment Interest as allowed by law.

G. Other Relief: Such Other and Further Relief as the Court deems just and proper.


**VII. JURY DEMAND**

Plaintiff demands trial by jury.


**VIII. PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendants, and grant the following relief:

A. Declaratory Relief:

A declaration that Defendants' conduct violated Plaintiff's rights under the Americans with Disabilities Act, the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 31-51q, and Connecticut common law.

B. Injunctive and Equitable Relief:

      i. An order enjoining Defendants from engaging in further unlawful discrimination, retaliation, harassment, and wrongful conduct;

      ii. Reinstatement to Plaintiff's former position or placement in a comparable position, or front pay in lieu thereof;

      iii. Expungement of negative or retaliatory personnel records;

      iv. An order requiring Defendants to implement lawful accommodation, reporting, and anti-retaliation policies and practices.

C. Monetary Relief:

      i. Back pay, including lost wages, salary, bonuses, and other compensation;

      ii. Front pay where reinstatement is not feasible;

      iii. Lost benefits, including retirement, health, and other fringe benefits;

      iv. Compensatory damages, including emotional distress, mental anguish, psychological harm, and loss of enjoyment of life;

      v. Reputational damages and loss of professional standing;

      vi. Punitive damages, where permitted by law;

      vii. Statutory damages and penalties as provided by applicable law;

      viii. Pre- and post-judgment interest as allowed by law.

D. Other Relief: Such Other and Further Relief as the Court deems just and proper.

E. Attorneys' Fees and Costs: Reasonable attorneys' fees, expert fees, and litigation costs as provided by statute and law.

Respectfully Submitted,

STEPHANIE LOMANGINO,
PLAINTIFF

By:/s/ Tyler J. Balding
Tyler J. Balding
Mark P. Carey
Elizabeth W. Swedock
Carey & Associates, P.C.
71 Old Post Road, Suite One
Southport, CT 06890
(203) 255-4150 tel
(203) 255-0380 fax
tbalding@capclaw.com
mcarey@capclaw.com
eswedock@capclaw.com

HER ATTORNEYS

**EXHIBIT 1**

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Boston Area Office**
15 New Sudbury St, Room 475
Boston, MA 02203
(617) 865-3670
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
### (This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 12/09/2025

**To:** Ms. Stephanie Lomangino

Charge No: 523-2026-00771

EEOC Representative and email:    NICHOLAS SOARES FULLER
INVESTIGATOR
NICHOLAS.SOARESFULLER@EEOC.GOV

---

## DETERMINATION AND NOTICE OF RIGHTS

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 523-2026-00771.

On behalf of the Commission,

Digitally Signed By:Feng K. An
12/09/2025

Feng K. An
Area Office Director

**Cc:**
Incident  Location
Family Voices, Inc.
35 Rundelane
Bloomfield, CT 06002

Tyler J Balding Esq.
71 Old Post Rd Suite One
Southport, CT 06890


Please retain this Notice for your records.

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* EEOC's official notice of dismissal**. You should **keep a record of the date you received EEOC's official notice of dismissal**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving EEOC's official notice of dismissal (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, or the ADEA, or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of your receipt of EEOC's official notice of dismissal and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of EEOC's official notice of dismissal, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method).  You may also submit a

FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 523-2026-00771 to the District Director at Arlean Nieto, 33 Whitehall St 5th Floor, New York, NY 10004.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 523-2026-00771 to the District Director at Arlean Nieto, 33 Whitehall St 5th Floor, New York, NY 10004.

You may request the charge file up to 90 days after receiving EEOC's official notice of dismissal. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

### NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

### "Actual" disability or a "record of" a disability

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.

- In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.

- **Only one** major life activity need be substantially limited.

- Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications)

**are not considered** in determining if the impairment substantially limits a major life activity.

- An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.

- An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

- "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

- The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.

- A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability."

*Note: Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.* For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

EXHIBIT 2

# STATE OF CONNECTICUT
# COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

Stephanie Lomangino
**COMPLAINANT**

CHRO No. 2610223

vs.

Family Voices, Inc.
**RESPONDENT**

## RELEASE OF JURISDICTION

The Commission on Human Rights and Opportunities hereby releases its jurisdiction over the above-identified complaint.  The Complainant is authorized to commence a civil action in accordance with CONN. GEN. STAT. § 46a-100 against the Respondent in the Superior Court for the judicial district in which the discriminatory practice is alleged to have occurred, in which the Respondent transacts business or in which the Complainant resides.  If this action involves a state agency or official, it may be brought in the Superior Court for the judicial district of Hartford.

A copy of any civil action brought pursuant to this release must be served on the Commission at ROJ@ct.gov or at 450 Columbus Blvd., Suite 2, Hartford, CT 06103 at the same time all other parties are served.  Electronic service is preferred.  **THE COMMISSION MUST BE SERVED BECAUSE IT HAS A RIGHT TO INTERVENE IN ANY ACTION BASED ON A RELEASE OF JURISDICTION PURSUANT TO CONN. GEN. STAT. § 46a-103.**

The Complainant must bring an action in Superior Court within 90 days of receipt of this release and within two years of the date of filing the complaint with the Commission unless circumstances tolling the statute of limitations are present.

_Tanya A Hughes_
_____
**DATE:**  January 29, 2026         Tanya A. Hughes, Executive Director

Service:
**Complainant's Attorney:**  Tyler Balding, Esq. (Via Email – tbalding@capclaw.com)
**Respondent's Attorney:**  Matthew Nieman, Esq.
                    (Via Email – matthew.nieman@jacksonlewis.com)

.